**UNITED STATES of America**

v.

**Trevis CALDWELL, Defendant**

**Nos. CRIM.02–41–P–H–01, CRIM.02–65–P–H.**

United States District Court, D. Maine.

Dec. 10, 2002.

Richard W. Murphy, Esq., Assistant United States Attorney, Office of the U.S. Attorney, Portland, ME, for United States of America.

Robert C. Andrews, Esq., Portland, ME, for Trevis Caldwell, defendant.

## MEMORANDUM DECISION ON DISPUTED GUIDELINE SENTENCING ISSUE

HORNBY, Chief Judge.

The question argued at the Sentencing Hearing in this case was whether certain prior state sentences should be treated as "functionally consolidated" for purposes of scoring a defendant's criminal history un-

der federal sentencing guidelines. Maine's Adult Drug Treatment Court in Cumberland County assembled the criminal charges pending against this defendant in three different counties and proceeded to impose two alternative dispositions for the resulting group: essentially concurrent probation on all charges if he was successful in the Adult Drug Treatment Court program; consecutive prison terms on all charges if he was unsuccessful. Although the Adult Drug Treatment Court entered no formal consolidation order, I conclude that its action "functionally consolidated" the sentences for purposes of guideline calculations.

Under federal Sentencing Guidelines, federal judges calculate a defendant's Criminal History by scoring various categories of previous criminal convictions. For scoring, the Guidelines instruct: "Prior sentences imposed in unrelated cases are to be counted separately. Prior sentences imposed in related cases are to be treated as one sentence." United States Sentencing Commission, *Guidelines Manual*, § 4A1.2(a)(2) (Nov.2002) (hereinafter "USSG"). A Sentencing Commission Comment defines the term "related sentences." USSG § 4A1.2, cmt. n. 3. Sentences are not related "if they were for offenses that were separated by an intervening arrest,"[1] a criterion that does not apply to the issue I am addressing here. For sentences that escape that disqualification, the Commission has a three-part eligibility criterion to determine if they are "related." Sentences are "related" if they "resulted from offenses that (A) occurred on the same occasion, (B) were part of a single common scheme or plan, or (C) were consolidated for trial or sentencing."[2]

---

1. This restriction was added effective November 1, 1991. USSG app. C, Amendment 382 (2002).

2. USSG § 4A1.2, cmt. n. 3. This three-part analysis is new with the Guidelines. Peter B.

Hoffman and James L. Beck. *The Origin of the Federal Criminal History Score*, 9 Fed. Sentencing Rep. 192, 193 (1997). Under the pre-existing Parole Commission's Salient Factor Score Manual, the question was much sim-

I am concerned with a single part of the final criterion: were the state offenses here "consolidated for ... sentencing?" The Commission has provided no guidance on what it means by the term "consolidated."[3] Courts and commentators have struggled with the concept as a result,[4] particularly in the absence of a coherent explanation and policy for the criminal history scoring procedure that might help give content to the term.[5]

The First Circuit has attempted to provide some definition. In *United States v. Correa*, 114 F.3d 314 (1st Cir.1997), Judge Selya announced that sentences imposed on the same day for criminal conduct that occurred on at least two different dates and arose out of at least two different courses of conduct (as is the case here) would not be considered "consolidated" unless there was "an actual order of consolidation" by the original sentencing court (not present here) or "some other persuasive indicium of formal consolidation apparent on the face of the record which is sufficient to indicate that the offenses have some relationship to one another beyond the sheer fortuity that sentence was imposed by the same judge at the same time." *Correa*, 114 F.3d at 317. But after

pler: if offenses were charged or adjudicated together, they were counted as a single conviction unless the offenses were separated by an intervening arrest. Otherwise each conviction was counted separately. Daniel P. Bach. *Reconsidering Related Conduct*, 9 Fed. Sentencing Rep. 198, 199 (1997).

3. Except for the recognition that the consolidation rule may sometimes result in undercounting of criminal history and require an upward departure. USSG § 4A1.2, cmt. n. 3. The recognition that upward departures may sometimes be required, however, does not give helpful content to the consolidation concept.

4. *E.g.*, Thomas W. Hutchison et al., *Federal Sentencing Law and Practice* 1211 (2002) ("Most of the litigation involving the related case definition discusses whether or not cases were consolidated for sentencing."); Bach, 9 Fed. Sentencing Rep. at 200 ("Unfortunately, as the caselaw demonstrates, the resulting test exhibits the complexity and incoherence that one might expect from such a theoretical compromise."); United States Sentencing Commission, *Draft Simplification Paper: Criminal History*, 9 Fed. Sentencing Rep. 216, 224 (1997) (related case rule "is one of the most frequently occurring areas of confusion in Chapter Four ...." "Both the definition and theory of [the three-part related case] rule are suspect. Thus this rule is probably one of the most confusing in Chapter Four.")

5. The Commission apparently took the basic outline for its scoring procedure from the "salient factors score" previously used by the Parole Board. Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L.Rev. 1, 20 (1988) ("the Commission decided to write its offender characteristic rules with an eye towards the Parole Commission's previous work in the area") citing 28 C.F.R. § 2.20 (1988); Hoffman and Beck, 9 Fed. Sentencing Rep. at 192; Aaron J. Rappaport, *Criminal History and the Purpose of Sentencing*, 9 Fed. Sentencing Rep. 184, 185 (1997). But the Parole Board was concerned only with recidivism, and devised its scoring from certain empirical premises related to recidivism, whereas the Sentencing Guidelines are concerned with punishment as well as recidivism. Moreover, the Sentencing Commission made modifications to the Parole Board scoring method (see note 2 above) without saying why. Interpreting ambiguous Guideline language is therefore doubly difficult. For speculation about the policies guiding the changes see Bach, 9 Fed. Sentencing Rep. at 199: "In all likelihood, the Commission was reacting to concerns that the Salient Factor Score led to results that, though justified in terms of specific deterrence and incapacitation rationales, ran counter to common notions of 'desert' and culpability." "[I]t may be that, in adopting the related cases concept, the Commission intended to create a system better calculated to holding a defendant accountable for his just deserts as measured not by his contacts with law enforcement but by the repeated, unconnected occasions of his criminal behavior." *Id.*

*Correa,* the Supreme Court explicitly recognized the concept of "functional consolidation" and announced that sentencing courts' decisions about what is functional consolidation should be reviewed "deferentially" by courts of appeals: "That is to say, the district court is in a better position than the appellate court to decide whether a particular set of individual circumstances demonstrates 'functional consolidation.'" *Buford v. United States,* 532 U.S. 59, 64, 121 S.Ct. 1276, 149 L.Ed.2d 197 (2001). In doing so, the Supreme Court observed that the nature of the functional consolidation inquiry "limits the value of appellate court precedent" and that it "is a minor, detailed, interstitial question of sentencing law, buried in a judicial interpretation of an application note to a Sentencing Guideline ... [not] readily resolved by reference to general legal principles and standards alone ... [but] bounded by case-specific detailed factual circumstances." 532 U.S. at 66, 121 S.Ct. 1276. The Supreme Court also revealed a remarkably broad view of what functional consolidation amounts to, stating:

> A district judge sees many more "consolidations" than does an appellate judge. As a trial judge, a district judge is likely to be more familiar with trial and sentencing practices in general, including consolidation procedures. And as a sentencing judge who must regularly review and classify defendants' criminal histories, a district judge is more likely to be aware of which procedures the relevant state or federal courts typically follow. Experience with trials, sentencing, and consolidations will help that judge draw the proper inferences from the procedural descriptions provided. [ ]In addition, factual nuance may

closely guide the legal decision, with legal results depending heavily upon an understanding of the significance of case-specific details.

532 U.S. at 64–65, 121 S.Ct. 1276.

I turn therefore to the details of Maine sentencing procedures to determine whether the sentences here were "functionally consolidated." Maine now has an "Adult Drug Treatment Court" in several regions. The program first got underway in 2000, when the Legislature directed the Judicial Department to establish a Drug Court Committee to plan and implement alcohol and drug treatment programs within the state court system, 2000 Me. Laws 780, § 2, and authorized the Judicial Department to adopt administrative orders and court rules to govern these programs. 4 M.R.S.A. § 421(1). The Judicial Department has created a detailed Policy & Procedure Manual that describes how the Court is to work.[6] Unitary (functionally consolidated) treatment of the defendant is apparent throughout. The Maine Judicial Branch recognizes the Court as "a specialized separate court," Manual § IX, and the Manual states that the most important principle is "active and continuous judicial supervision of the offender's *case.*" Manual § XIV(2)(a) (emphasis of the singular added). According to the Mission Statement,

> The mission of the Adult Drug Treatment Court is to hold criminal offenders accountable, to stop criminal activity related to the abuse of alcohol and drugs, and to increase the likelihood of successful rehabilitation of offenders through early, continuous, and intensive judicially supervised substance abuse treatment and other appropriate rehabilitation services that will allow participants to be-

---

6. I am using the "Adult Drug Treatment Court, Policy and Procedure Manual," promulgated in April 2000, as revised by the State–Wide Steering Committee in March 2001 (hereinafter "Manual").

come more integrated into the community as a[sic] productive and responsible members of society. Manual § I.

Several of the stated objectives are consistent with functional consolidation: to "coordinate case processing and monitoring of participants in ADTC who have multiple contacts with the legal system"; to "coordinate ADTC with domestic violence intervention" through "monitoring compliance with existing court orders . . ."; and to "reduce costs associated with criminal case processing and rearrest." Manual § II. If charges are pending in another county, the prosecutor there "must be willing to transfer those charges to the county served by the drug court program." Manual § III(3). After preliminary screening, the drug court "may enter an order approving the defendant for ADTC screening/assessment and continuing the case" (perhaps meeting *Correa*'s standard) and set conditions of release while further evaluation continues. Manual § III(9). A drug court case manager supervises the screening process arrangements. Manual § IV(3). If a defendant is found eligible, he/she has a screening meeting with a contracted treatment provider or probation officer. Manual § IV(5). The screening is comprehensive on a number of levels (just a few are substance use, mental health, violence including domestic violence, living and working environments) and involves "a comprehensive cross-check of court records" to "identify other cases in which the offender is involved." Manual § V(1)(e).[7] The case manager, treatment providers and probation officers orient the defendant to "program requirements." Manual § V(2). If a defendant passes screening, he proceeds to "assessment." Thereafter, "Admission to the ADTC is in the discretion of the Judge/Justice." Manual § VII(1). The defendant must enter into an ADTC contract with rewards and sanctions, Manual § VII(10)(b), and a plea agreement. *See* Manual §§ VII(4), (6), (9), (13). The Manual notes that defense counsel "will continue to be the attorney for the client until *the case* is finally concluded in Court." Manual § 10(d) (emphasis of the singular added). Pursuant to a plea agreement, the defendant pleads to all charges before a single judge, and then receives two alternative dispositions: (1) what will happen if he/she behaves (generally concurrent probation, along with intensive supervision by a probation officer, and weekly appearances before the judge and other drug court personnel for specific congratulations or tongue lashings and short incarceration up to 7 days); and (2) a promised set of sentences on all pending charges that will be imposed if he/she seriously misbehaves and is expelled from the drug court program. Manual § VII(12).

The Program Manual nowhere refers to actual consolidation. But it seems inescapable that this program amounts to "functional consolidation." Throughout, the identified criterion is "success in Drug Court," Manual § V(3)(b) or in "the program." Manual §§ VI(5)(g), VII(12). The whole philosophy is to put the defendant under one course of supervision with one judge, one prosecuting attorney, one case manager, one probation officer, confronting and supervising the defendant under a set of concurrent probations, with the desired goal that he/she will succeed and emerge from "the program." Likewise, at the time of acceptance into drug court, an alternative disposition is crafted for failure, specifying the penalty that will be visited upon such a defendant. Even though that disposition is described offense by offense, with no official order of

---

7. See also Case Management, Manual § XV(2)(d), instructing case managers to "Collect information regarding all pending charges."

consolidation, and is described as "reinstatement of regular court processing," Manual § IX(3)(d), the result is clearly unitary.

That is what happened in this case. Specifically, two cases were transferred from York County to Cumberland County. As the presiding justice stated according to the transcript, "It's been transferred here for—for involvement." *State of Maine v. Trevis Caldwell*, April 5, 2002, Tr. at 7, ln. 9. Another case was transferred from Oxford County. On March 29, 2002, the defendant signed an "Entry/Bail Contract" and the presiding justice signed an "Order Admitting Defendant into the Adult Drug Treatment Court." The defendant also entered into an Adult Drug Court Plea/Admission Agreement covering all the cases. Portions of the hearing transcript reveal the unitary nature of the proceeding. The prosecutor told the presiding justice:

It's going to be sort of confusing, but this is what—what we're hoping will happen. On what is Cumberland County docket Number 02–591, which is a probation case that was transferred here from Oxford County, we simply need for you to sentence the defendant to five months, credit for time served, probation to continue.

Court: Okay.

[Prosecutor]: All right? I need for you to take guilty pleas on 01–1194, which is a Rule 11, Class E theft; 02–355, which is a transfer case from York County. There's an information prepared and a waiver of indictment in the file. That's a Rule 11, Class C, eluding a police officer. In 02–356 which are four misdemeanors transferred by complaint from York County—and just if you would take pleas on that—all these three cases that you take pleas on will simply be continued for sentencing.

Tr. at 2–3, ln. 13–3. The presiding justice proceeded to tell the defendant that

there are certain negotiations that have been entered into involving the drug court, and there's a—there's a good result in drug court and from your perspective there's a—there's a bad result—and actually from my perspective there's a bad result, that if you fail, you know, there are substantial sanctions that are going to be imposed against you.

Tr. at 5, ln. 6–12. He also stated:

All right. The plea negotiations have been entered into, and you fully understand the ramifications of—of successfully completing the drug court program or failing in the drug court program, is that right?

Tr. at 8, ln. 22–25. The defendant said that he understood.

As a result, the defendant received concurrent sentences on all charges that, through credits such as time served or suspensions, resulted in probation.

[Defense Counsel]: If he's successful, the intention of the parties here is to make sure that he doesn't go back to jail, that the time served on the five months that he's being sentenced to the probation revocation today would then translate into time served on the other docket numbers, on successful completion.

Court: All right. That's my understanding also . . . .

Tr. at 9–10, ln. 24–5. If he failed the program, he was promised consecutive sentences of specified lengths of imprisonment on each charge.

Court: So, if you don't successfully complete the drug court, then the sentences would be, in 02–356, four months; 02–355, six months; 01–1194, thirty months with all but six months suspended, three

years of probation with conditions to be determined at time of sentencing, as well as restitution if that was an issue, and they would run consecutive with one another and the sentence imposed in Oxford County Docket Number 00–355[sic]. And there's a restitution component of $3,535.50 that's spelled out here. Have you carefully reviewed all aspects of the plea agreement here?

Tr. at 9, ln. 7–16. After establishing that the defendant understood everything, the presiding justice stated:

I'm sentencing to the five months with credit for time served, approving the plea agreement, and I—I want to welcome you into the drug court.

Tr. at 10–11, ln. 25–3. In short, it was hardly a scheduling "fortuity" (*Correa*'s term) that this defendant received all his sentences on the same date from the same judge. It was a functional consolidation within the scope of *Buford* and probably even within the scope of *Correa*. Ultimately, this defendant failed the Adult Drug Treatment Court program and therefore the presiding justice replaced his concurrent probations with the consecutive prison sentences that had been promised. But that does not remove the functional consolidation that occurred when the two alternative dispositions were crafted.

As a result of the foregoing analysis, paragraphs 68a, 69 and 69a of the Presentence Report shall be consolidated. Adding the sentences together yields 16 months (6 plus 4 plus 6) for a score of 3, bringing the total Criminal History Points to 11. With that calculation and my earlier rulings, the Criminal History is V, and the Offense Level is 24 for a Guideline range of 92 to 115 months, plus a mandatory consecutive sentence of 120 months on CR02–41–P–H–02, Count II.

The Clerk shall set the matter for immediate sentencing.

So ORDERED.